The next case for argument, case number 24-1912 from Eastern Missouri, Derrick Jones et al. v. City of St. Louis, Missouri et al. Miss Duncan Good morning and may it please the court. This is a case, as your honors know, brought by detainees at St. Louis Maximum Security Jail against various correctional officers in the city for excessive force and ADA violations. After a motion for summary and judgment that we filed, we believe that the district court got it wrong. The district court erred in denying defendants motion for summary and judgment in three main ways. The first is because the district court failed to analyze specifically each individual defendant in assessing the qualified immunity warranted to them. Secondly, the district court erred in denying qualified immunity to these specific defendants. So how many page opinion do you think there was a minimum to decide? Is that a matter of a minimum amount of pages? I know that the plaintiff How many different individual defendants for each claim? I mean, this notion of whether it can ever be collective or it always has to be individual, my gosh, it's got to turn on. How many defendants and how many claims and how many distinctions are there in the analysis? And so, Judge, I think what you're referencing is a case that the plaintiffs point out, which is Heartland. I know about Heartland, but it's a case specific question. Right. But in this case, we're talking about multiple plaintiffs on multiple different days involving different circumstances, involving multiple defendants and their use of force and the reasons for their use of force. It's just too distinct. What's your best case in a comparable fact situation, which Heartland isn't? Well, for our best case for the use of force situation is Jones v. Shields. So in Jones v. Shields, an inmate was ordered to mop the floor of the kitchen. He refused. The inmate was threatened with discipline. He got chippy with the correctional officer. The inmate was sprayed. There was no treatment for his spray for the next 20 minutes or so. And the court held in that case that that was a de minimis injury and that the use of force under those circumstances was OK. The key language in that case states, we similarly conclude a limited application of capsicum to control a recalcitrant inmate constitutes a tempered response by prison officials when compared to other forms of force used in such manner and purpose. The court says its application should rarely be a proper basis for judicial oversight. And in here, in this case, that's what we have for defendants. For the plaintiff, Derek Jones, for example, there's a video at the record on on the Appendix 129. These circumstances occurred in December of 2020. A nurse instructed Derek to into his cell after it was thought that he had exhibited COVID symptoms. He refuses to go into his cell multiple times. He crosses into a red line behind some of the correctional officers. And afterwards, Defendant Richard applied one quick burst of spray. This is similar to the case in Hampton, which this court affirmed from the lower court in this jurisdiction. In that case, a detainee crossed into the officer only red line zone and continued to refuse commands by the CO to get into his cell. The inmate was sprayed, the detainee was sprayed, and it was found that that officer's use of pepper spray was justified. In this case, it's it's even more of an extreme example than it was in Hampton, where in in this case, there was thought that the inmate was positive for COVID. Throughout case law, and it's well known that COVID was was a life threatening virus, that it was particularly dangerous for people living in close quarters like inmates. And so precautions had to be taken. So it was even more extreme example of the need for order and safety than there was in Hampton. Counsel, I apologize, but I'd like to go back to your first point on the individualized analysis. Sure. Do you think we have enough information from the district court's order to assess each claim? Or do we need to remand it for the court to do a better job of individually assessing each claim against each defendant? I think that there's support for doing both. I think that the court. Sorry, you got to you got to have the mic closer for me. I'm sorry. You're just fading out of almost every sentence. I'm sorry. I'll get my voice up. Thank you. I believe that you that the case all bears out that you can decide one of two options. You can either do the individual analysis yourself at the district court failed to do, or you can remand back to the district court and tell them to do a better job. As you said, I think the parties are in agreement that we would like to know what we're working with here. I mean, we we've been at this for a long time. And so you making the decision would would short circuit that. Having said that, if I were in your seat, I would remand it back because it is the district court's job to do this analysis analysis. And it tees it up for a better opportunity for you to be able to determine what was considered as clearly established. What action violated the plaintiff's constitutional rights? And right now, because of the district court's order, unfortunately, you're kind of flying blind on that. I've attempted to do that. And it's it seems to me it's possible for some of the defendants. But I have trouble assessing from the order before us who's responsible for certain actions, such as the allegation that certain plaintiffs were subjected to pepper spray residue for prolonged periods of time after compliance was obtained. Right. And that's part of the problem. I will say, too, as a municipal attorney, you know, we wear multiple hats. One is we do this. We defend our clients. Another is we advise them. And we like to sit down with our clients and go over the judge's order. And if I were to do this with, you know, with Richard or with Wills, who had absolutely no hand in spraying anyone at all, him being lumped in with defendants generally in the district court's order does him a great disservice and doesn't provide him with any guidance as to what he needs to do differently in the future. So I agree with you that the district court's order and what it decided is very difficult to discern and leaves you with little analysis to know who who is at issue. And that's the that's the issue with the district court's order. It doesn't say the who, the what, the where, the why. It doesn't give a thorough qualified immunity analysis as I'm confused. You're arguing like this is a final order. It's an interlocutory order, right? It is, Judge. It's denying qualified immunity on the record at the time and denying summary judgment on the record at the time. Why do we have to why do we have to run through it now? Because it's qualified immunity, Judge. And the Supreme Court over and over again has talked about how. Everything's qualified. You know, that's no that's an easy answer, but it's an inadequate answer. We send things back because because qualified immunity or its denial can be revisited at any time all the way up to and even after trial. So why do we have to why do we have to tell them why do we have to order a do over now? If this record doesn't even let us get at what you think, your clients think, they ought to be able to get out of jail free now. Well, Judge, over and over and over again, the Supreme Court and this court as well has said that qualified immunity analysis is important. It should happen at the earliest possible stage of litigation because the whole point of the immunity is that we not have to proceed forward. And Johnson and Johnson v. Jones and a lot of other cases, it's not always possible. But in this in this case, the record is prolific. I mean, we've we've given you about 12 boxes full of of of the record. There's more than enough information here with what we have for you to make a decision on this. Not in the district court order, not what's listed in the district. From what I know, the answer is call your first witness. We would disagree, Judge, that that it's important that these individual officers be permitted the qualified immunity analysis that is required under the law. And that if it is determined that they can get it after trial as a matter of law, the court has to do that. But then it impermissibly wastes the court's time. It wastes a juror's time to go through all of this when at the first place they did not violate a constitutional right or that right was clearly established. Who disagree with you on the wasted time question? Excuse me. I'm sorry. We have an experienced district court judge who disagrees with you that it's a waste of time. Well, with all due respect to that district judge, it's it's qualified immunity over and over again has been assessed at the earliest possible time, whether it was on a motion to dismiss. How many times? Sorry? I mean, you were a schoolgirl probably the first time I wrote that in an opinion. Probably so, Judge. So, you know, you don't you're in theory you're preaching to the choir, but case by case, sometimes the choir gets a sore throat. Fair enough. I have a question regarding officers Alexander and Borders. It's my understanding that they have not made any argument on appeal challenging the denial of their qualified immunity. Is that correct? That is correct, Judge. We didn't think that that there, you know, three of the four incidents that we talk about, three of the four plaintiffs, rather, are on video. The other were admitting whatever testimony he's given as to persistently refusing orders with Borders and Alexander. There is no video. And we do believe that those would be contradicted facts so that it wouldn't be worth the court's time to review. So that is correct. What's the status of count nine? I didn't see any analysis.  The status of count nine. I didn't see any analysis by the district court. I think the other side may have said that you didn't move for summary judgment or you didn't litigate count nine. Could you refresh my recollection as to what count nine was? It's the turning off the water claim. The water point. Yeah. The district court was silent on that. I think it's clear, and in briefing it came out, that with Foulkes there was no argument being made or any claim being made against him on the water count. And that is, of course, because they can't pinpoint it. I think they point to there was one deposition. You moved for summary judgment on count nine, right? Yes. Yes. We moved for summary judgment on all counts. But it wasn't addressed. I don't know. It wasn't addressed in order, to the best of my memory. And it's one of the reasons, you know, moving on to the Minnell claim. There was two. One was for the water. The other was for excessive force. And there is no personal liability that attaches to get to the water shutoff claim to the city. And that is the issue in there. For excessive force, they have to show a custom, which is so widespread and pervasive as to constitute the effect and force of law. It's a high standard, and it's designed to be. And in this case, we have – there's a misconception, I believe, of plaintiffs that a use of force automatically means an excessive use of force. And they point to a bunch of use of force reports that correctional officers have self-reported and claim that, therefore, there is an excessive amount of force used. Excessive versus unreasonable. It has to be one or the other. Excessive is one example of unreasonable. But if it isn't unreasonable, it isn't actionable. Right. But even still, they make that mistake of saying, look, there's all these use of force reports. Therefore, there was force used, and therefore, that is unconstitutional. But the analysis doesn't – Go ahead. Finish. But the analysis doesn't stop at whether force was used in and of itself. The analysis goes beyond that to see whether that use of force was unconstitutional, whether it crossed a constitutional boundary or border. And thus, the use of force reports that they showed simply are not sufficient. I wanted to ask you a question that might be somewhat related to that. You have not used these words this morning, but the city's brief claims that the force must be malicious and sadistic. Can you point to any Eighth Circuit authority that supports that standard for pretrial detainees?  Correct. So that's the Eighth Circuit standard. No. Or the Eighth Amendment standard. That's the punishment standard as opposed to the – Right. And it's the subjective – And we have to protect the Amendment Due Process Clause here, which is a different standard. That's correct. So you agree that it doesn't have to be shown that it's malicious and sadistic? Correct. Kingsley addresses that issue, and we've addressed that in the reply brief, that it negates that subjective prong of being malicious and subjective. I think I'll reserve the rest of my time if I could at this point. Thank you. Ms. Hammond? Good morning, Your Honors, and may it please the Court. Defendants repeatedly ask this Court to view disputed facts in their favor, to revisit facts that the district court correctly afforded plaintiffs as the non-moving party, the best version of those facts, and to overlook binding precedent from this circuit that put defendant officers on notice that they violated clearly established law by using super-soaker quantities of chemical agents on plaintiffs who were – all of whom were either restrained or presented no security threat. Defendants – It's not very clearly established. We've got cases going both ways. Well, Your Honor, I've spent some quality time with the line of cases beginning with Jones v. Shields and going through Peterson v. Heinen in 2023, and I submit, Your Honor, that I believe the line is clearly established, so that if you look to cases – I think Treats v. Morgan spells it out well. I think Burns v. Eaton, which Your Honor obviously wrote, spells it out well, that the use of a limited amount of O.C. spray on an actively resisting or fully recalcitrant detainee does not present a constitutional violation, but use of large amounts of spray on someone who is not presenting a security threat, an articulable security threat, does violate the Constitution. Well, I guess that's the question. At what point are you constituting a security threat? As I watched several of the videos, at a minimum – you're right. They weren't fighting or anything, at least in most instances they weren't fighting, but they also weren't responding to commands. So at what point – they have some right to be able to maintain control in the prison, right? Absolutely. So we are not contesting that some use of force can be used for a detained person who is persistently refusing commands such that the refusal of those commands is presenting some kind of threat to either physical threat or a threat to the order of the facility. But I think Your Honor could look to Treats v. Morgan, which is still good case law in this circuit, where this court explained that just because there was maybe an initial compliance or an initial noncompliance or a momentary questioning of orders or some sort of arguing, this court has never held that that means that officers are able to use the summary application of force as the method du jour of responding to any problem. We've probably had at least 10 excess force opinions in the last five years, some in bank, and you're relying on a 20-year-old precedent? And the law was, if not different, it was certainly less developed. Well, Your Honor, we could also look to Peterson v. Heinen, which is from 2023, which of course cites Treats v. Morgan as one of the foundational cases. And one thing I think is clear from Peterson is Peterson analyzes, I would say, six or seven uses of force on a detainee. And I think it shows how the line is clear, because in – forgive me if it's six or seven, but in – Your – I think – I need to ask you, what do you assume you win if we affirm? No qualified immunity, period? If you affirm, I believe that this case goes to trial, where a jury gets to decide which –  Discovery is closed, Your Honor. And so I think that what defendants are primarily asking this court to do is to take facts in their favor. So you, for example – But I don't think – I would not write, if I were the author here, that you've won qualified immunity. And I wouldn't say – I would not preclude the district court from entertaining further pretrial proceedings on this issue, to the extent it's undeveloped. Well, Your Honor, I think as you correctly noted – Are you accepting that or not? I don't think I could deny that, Your Honor. I mean, it's an interlocutory order. Well, okay, but that's not the way you're arguing. Well, Your Honor – This goes to trial. I think it would go to trial. I mean, if defendants were to submit another motion for summary judgment, I think the district court could entertain that. Standing here today – With evidence. Sorry? With evidence. If the defendants were to re-put their evidence into the brief? More evidence with a motion to lift the scheduling order and reopen the pretrial record. There would be plenty of discretion to grant that. I would agree. It looks like a case where it might be the right thing to do. So I think that would be in the discretion of the district court judge. I will note, Your Honor, that the – And I'm just warning you, you're overreaching along with the clearly established argument. So, Your Honor, I think that if the district court were to reopen this, we would still submit to Your Honor that there is ample evidence in the record which opposing counsel – You want to be able to argue law of the case. And I'm just suggesting don't count on it. Certainly. I mean, I think opposing counsel, as mentioned to Your Honors, you have a variety of ways that you could rule in this case here. And one thing that I think is important in talking about the adequacy of the district court's opinion is that the district court's opinion mirrors the briefing that was submitted to it. So, for example – Counsel, let me ask you this. In terms of this court's ability to conduct an individualized analysis as to each defendant, do we have enough information from the interlocutory order that's before us to assess who is responsible for some of the plaintiffs allegedly being exposed to pepper spray for days and days after compliance was obtained? Sure. So, what the Supreme Court noted in the case of, I think, Behrens v. Pelletier is that what this court is to do is to look both at the facts in the order and then also what facts the district court likely assumed. In the order itself, just turning to its discussion of the facts, and I would note that the district court does go through each plaintiff, does go through each use of force, does lay out facts. And I think that the record has – the full record with the depositions and the thorough summaries of each use of force on each plaintiff contains information about each officer's involvement. So, Your Honor, I believe – Let's look at the example of Plaintiff Withers, for example. The allegation is that he was left in contaminated clothing for two days with no opportunity to shower, resulting in burns to his skin and breathing trouble for days after he complied with the request of the officers. Do we know from the record who is alleged to be responsible for that? I believe what the record would support is that for some period of time after the spray, the correctional officers that were on scene for the spray continued to have sort of immediate control of that detained person. So for Mr. Withers, I don't think the record would necessarily support for the full – for multiple full days that it was Defendant Jones and Defendant Wills. But certainly for a period of time, it was those defendants that did not allow him quick access to any kind of ameliorative remedies for the effects of the spray. You know, Your Honor, I would also – The reason that's significant is that under Kingsley, there must be a legitimate non-punitive purpose. And if there's not a legitimate non-punitive purpose, there may be liability. Right. And so I think that – you know, I think what our – what the cases support – so opposing counsel talked about the case of Jones v. Shield. And in that case, I think the person was afforded medical care within 20 or 30 minutes. And I think the spraying defendants had – the record would support that they had control for a significant period of time. Particularly, Lieutenant Foulkes, for the multiple plaintiffs who he left in a room deliberately while he filled the room up with mace, you know, the record has evidence that he said things like, let them marinate. Now he feels it. Let him sit in it. And for those individuals specifically, I think it's clear that from that testimony that there was an intent to inflict specific harm by leaving them in the mace, like fully in the mace. Plaintiff Jerome Jones testified he had to get on the ground of the visiting booth and sort of try to suck air from where the door met the ground because there was so little other ability to breathe in the amount of mace in the room. So I think for those defendants, I think Foulkes' liability for that after effect is clear. To Your Honor's point, if plaintiffs were not afforded a shower for days and days, I think that amplifies the injury to them. And I think that goes to the pattern and practice in the facility of which there is robust evidence in the record. I wanted to briefly address some of defendants' arguments about the Monell claims. First of all, Your Honors, we do not think that there's pendant appellate jurisdiction for those claims. I mean, I think defendants' counsel admitted that some of the claims they didn't even move for summary judgment on. So part of this case survives in the district court. And as such, the Monell claim isn't going to be fully, you know, it's not inexplicably intertwined such that an opinion on some of these uses of force would necessarily negate the Monell claim. So we don't think there's appellate jurisdiction, but we would also disagree with defendants' characterization of the Monell evidence. It is not simply that we've said every time anyone gets O.C. sprayed, that's a constitutional violation. That's in no way our position. That's not the position we've taken. What the evidence shows, looking at some of these videos, the few videos that were not deleted, looking at the many use of force reports, looking at the declarations from detainees, of which there are dozens, there are situations where people are being sprayed for having mental health crises. People are being sprayed for talking back to correctional officers. People are being sprayed when there's just no active resistance at all. And, Your Honors, I think to Judge Grunder's point earlier, I would also note that defendants in characterizing the actions of our plaintiffs characterize those actions as noncompliance when really it's an issue of fact as to compliance. So in the case of Peterson v. Hyndman, the court there, Judge Strass writing for this court, talked about how the plaintiff said he was trying to comply, but slowly the officer said he wasn't being compliant. This is for the use of force that survived. He said that issue of compliance goes to a jury versus other uses of force where there's spitting, kicking, charging at officers, none of which happened here. That is not clearly established. They crossed the red line a couple times in a couple of those incidents. So we have eight uses of force alleged in this case, and only two of them is the person not restrained in some way, either in a locked room or in handcuffs. For Derek Jones, which is one of the two situations where a person is not being actively restrained by his security guards or in handcuffs or in a locked room, we would submit that the video shows that he crossed a line briefly, came right back over it, and that it was not an intentional charging towards the officer, as you see in Jones v. Shield or in Hampton. But, Your Honor, we could also look just, for example, opposing counsel referenced our plaintiff, Jerome Jones. He says he admitted noncompliance, but that's not the correctional officer's version of the facts. That's not the plaintiff's version of the facts, and the plaintiff's version of the facts are that he said, I don't want to move cells, but after they said cough up, he peacefully submitted to handcuffs. He walked with the officers to a visiting booth. He presented he did not fight. He did not kick. He did not threaten. He did nothing, and they still put him in a visiting booth and filled the visiting booth up with O.C. spray. And that, even if someone says, I don't, I didn't want to move cells, even if there's an initial noncompliance, there was initial noncompliance in Walker v. Bowersox and in Lawrence v. Bowersox and in other cases in this Court. And What about the instance where a detainee was asked five or six times to step in? In other words, go back to your cell, and they refused. Doesn't that create a safety risk for the officers that would justify some force? So I think at some point, a detainee's refusal to step in, combined with things like threats, especially if the officer has given a clear warning, which none of, at no point for these cases, would the facts in the light most favorable to the plaintiff say that. We have recent cases saying the clear warning is not an absolute prerequisite to using force against a resisting or walking away inmate. Absolutely not. It's not a per se violation not to give a warning. But to answer Judge Gross's question, if you have someone who's totally passive, not presenting any threat, but just not moving, for example, that is a case where a warning would be the most effective, right? Because the person is not presenting any kind of physical threat. That's wonderful hindsight. So, Your Honor, we believe that the cases do, you know, we would submit there is a line, but as Your Honor would know, we think that the district's order here is sufficient at this stage, given the briefing that was submitted to it. You know, the appellate court. What's the status of count nine? Yes. Thank you, Your Honor. I was actually meant to ask that. I was confused by opposing counsel's answer. So I read count nine, I believe, as the water shutoff claim against the city.  And I read the district court's opinion on page 12 and 13 as denying summary judgment on that count. So beginning halfway through page 12, that the water shutoff claim as to the city's liability for correctional officers denying inmates of drinking and potable water. I see my time has expired, Your Honor. So there's no individuals in that count? May I briefly answer your question, Your Honor? No. Yes.  I have one too. Great. I've got as long as you all have. So we originally sued Lieutenant Folks and we sued the city for having a custom and practice of this. The city moved for summary judgment against Lieutenant Folks on the basis of qualified immunity and against the city. And we believe that the evidence shows that there were unconstitutional actions being taken by officers, including Lieutenant Folks, in shutting off water for punitive purposes. And the district court denied summary judgment on both. I will say, Your Honor, that we did not focus our summary judgment arguments on Lieutenant Folks' specific liability for that. What we believe is that it was an unconstitutional practice of multiple employees at the city justice center for which the city is liable. So we focused our arguments on the city's liability for that. And I will just in one sentence say that I think opposing counsel is wrong, that there needs to be individual liability. It's whether or not there was an unconstitutional action that allows for Monell liability, not a specific officer being liable. A.D.A., do you argue we don't have appellate jurisdiction? I would argue that, Your Honor. I don't read it in your brief. I need a case site, because that makes no sense to me. So, Your Honor, opposing counsel appears to fault us for not having ---- I just don't want to ---- we're over time. Got it. If you're arguing jurisdiction, I understand the merits argument. Great. If you're arguing jurisdiction, I need a case because it strikes if Title II does not allow jurisdictionally a claim against a city, and why wouldn't we take that up now? So the only entity we can sue under Title II of the A.D.A. is the city. So that's the case of Allsbrick that this city decided ---- that this court decided. And so because the only entity we can sue is the city, we cannot sue individual officers in their individual capacity.  That was held in Allsbrick. The court reiterated that in Barabow. Where's your jurisdictional case? Well, Your Honor, I ---- I just want to take it up now. Well, Your Honor, I don't believe we can because it's a claim against the city. And so because it's a claim against the city that's under a completely different precedent ---- So it's ---- but it's not like the Monell tag-along. This is a freestanding separate claim, failure to state it jurisdictionally, failure to state a claim. And it's up here along with an appealable interlocutory order. Give me a case that says we can't consider it. I think that, well, Your Honor, I believe that we cited a plethora of cases about how the only claims ----  That doesn't answer the question. That's why I asked the question. Your Honor, I believe we cited ---- I believe the court only has jurisdiction over claims that are inexplicably intertwined with the qualified immunity issues. Well, you say that, and I know the case law you're drawing from. Sure. But I want a specific case that applies that literary generality to this issue. So, Your Honor, what I will say, well, Langford v. Norris, 2010, dismissing ADA appeal because there is no evident basis that that claim against a city, which is a freestanding claim, as you know, a separate test, isn't explicitly intertwined. I'm well over my time, so I thank you for the privilege of speaking before you.  Thanks. Thank you. We have about a minute left, so I'll make this brief. The depiction from the plaintiffs in this matter is that all of these plaintiffs were super-soaked with pepper spray and that that is their version of events and that the court should blindly accept that. Unfortunately for them, however, there are three situations of three different plaintiffs that are captured by video evidence. The plaintiff, Derek Jones, Withers, and Roussan, are all on video, where the court can clearly see that multiple uses in that video are short bursts of pepper spray that does not super-soak them, as plaintiffs convey. And it emphasizes, really, the need for this individualized analysis, because by video evidence, many of these defendants did not do what they said that they did. And finally, I think throughout this discussion with opposing counsel, there was an acknowledgment that at some point, force should be used. At some point, pepper spray can be used. And the problem for them is that that point is not clearly delineated. It is not clearly delineated how many minutes are needed before treatment is required after pepper spray is dispersed. There is no clearly established law as to how much pepper spray crosses a constitutional line. There is no clearly established law as to how long a correctional officer must wait until pepper spray may be dispersed. And it's because of all these things, and because these lines are not clearly delineated, the officers are entitled to qualified immunity. And with that, we ask that the district court's order be reversed or that it be remanded. Thank you. Thank you, counsel. It's a complicated case, and it's a lot of issues. Thoroughly briefed, that argument's been helpful. We'll take it under advisement.